# COURT OF ERRORS AND APPEALS.

## JUNE TERM.

## 1870.

GEORGE WIEST Complainant below, Appellant, *v.* RAN-
DALL B. GARMAN, ALEXANDER McCONAUGHY and JAMES
B. RIGGS, defendants below, Respondents.

After the parties to a contract for the sale of lands have gone so far as to
execute the contract by conveyance of title, the transfer of possession
and the payment or securing of the purchase money, the Court of
Chancery will not unravel the transaction merely to relieve against the
hardship, or even great injustice of an unequal bargain. A contract
executed will be set aside only where either there has been mistake
materially affecting the subject matter of it, and with respect to which
the contract cannot be reformed, or where the contract has been pro-
cured by fraud, in some of its forms of misrepresentation, circumven-
tion, or undue influence.

But misrepresentations made by the vendor to the purchaser of a farm at
an exorbitant price as to the value of the crops produced and the cost
of improvements made on it the preceding year, at the time of selling
it to him, even if they form a material inducement on the part of the
purchaser to buy it, will not be ground for a decree rescinding the sale.

With reference to the effect of fraudulent misrepresentations by a vendor
touching the property sold, there is a material distinction in a court of
equity, whether the bill is for the specific performance of a contract yet
unexecuted, or it is a bill to rescind a contract which has been executed.
It is in this last class of cases that courts of equity so stringently apply
the maxim *caveat emptor*, a hard, stern maxim, but one founded both
on justice and policy.

Although for mere inadequacy of consideration without other circumstances, a contract executed will not be rescinded, yet an unconscionable bargain made with a person of such weak understanding as to be incapable of self-protection, though not an idiot or lunatic, raises a presumption that it was procured through some fraud, or undue influence ; and on this ground equity will relieve such a person against a transaction which it would not,if it had been made with one of ordinary capacity. However the court interferes in this class of cases with great caution, and only where the mental weakness to such a degree as disables the party for self protection is clearly made out in the proof.

In all the cases in which the question of fraud, undue influence, or incapacity is raised, inadequacy of consideration is a material element ; that is, by it proof on these points which otherwise would be doubtful, may be rendered decisive. In a case where the capacity of a party to bargain is left in doubt, the very exorbitancy of the bargain may convince the court that the party must have been unfit to transact business and have become the dupe of some imposition. But to have this effect the inadequacy must be gross, and such as to shock the conscience and confound the judgment of any man of common sense. In all the cases in which inadequacy of price or value, has been treated as a material consideration, it has been of this gross character; and the inequality has not been less than half the value.

APPEAL from the decree of the Chancellor sitting in and for Kent County, dismissing the bill of complaint in the court below, before Gilpin, C. J., Wootten, Houston and Wales, Associate Judges.

The bill of the complainant, George Wiest, stated that prior to the month of August 1868, he was a citizen of the State of Pennsylvania, and had been engaged nearly all his life in farming in Snyder County in that State ; that he had seen but little of the country beyond it, and had no experience in business, except what pertained to the daily and ordinary transactions of life ; was of German extraction, and generally spoke that language, and the English but rarely and imperfectly ; that he never was a good judge of the value of real estate anywhere, and that at the time of the transactions hereafter stated, he had no knowledge whatever of the value of real property in this State, except only what he received from others, and that he was credulous and much inclined readily to credit and implicitly rely upon the statements and representations of

other parties in such matters without hesitation or suspicion.

That about the time before mentioned two of the defendants, Alexander McConaughy and James B. Riggs, whose business was that of general agents for the sale of real estate, and who resided in the town of Clayton in said county in this State, addressed to him at his residence in Pennsylvania, a printed circular together with a written letter containing a very favorable and flattering description of a certain farm which they had in hand for sale near there, and inviting him to visit them and take a look at it and to buy it if he liked it, particularly stating as one of the inducements, that the owner had the year before made over four thousand dollars from the products of it, and that it was the best and cheapest farm they had for sale. That relying upon the truth and honesty of their representations, he soon after visited them and was immediately conducted by them to the farm and house of Randall B. Garman, the other defendant, who then owned it and lived upon it. That the latter took him over the farm to view it, giving him all the while as they proceeded, the most encouraging and flattering accounts of its value and productiveness, and repeated particularly the statement before mentioned, that he had made four thousand dollars off it the year before; and when asked expressly by him, if he had made that much from it the preceding year, he emphatically reiterated the assertion without any qualification whatever. The complainant then inquired the price he asked for it, to which he replied that he would not take less than twenty-two thousand dollars for it—that was his lowest price, the other two defendants who were present at the same time affirming that it was the cheapest farm they had for sale; and that Garman on the same occasion informed him that he had expended five thousand dollars in improvements upon it, and his only reason for selling was that he was tired of farming. That relying upon the statements and representations so made to him, he agreed to buy it at the price stated, and paid him thereon at the

time as earnest money to bind the bargain, one thousand dollars.

That after his return to his home in Pennsylvania he received a letter from the other two defendants, addressed to him as "Dear Friend," warning him against meddlesome persons who they found would try to dissatisfy him with his bargain. That it was whispered about that such persons were writing to him to throw it up, and which he had a right then to do under the stipulations of the contract on account of the excessive price he was to pay for it; and also that Garman might have got twenty five thousand dollars for it a short time after he had agreed to buy it, but the latter would not fly from his bargain. That he believed the same was concocted and written by all of the defendants for the purpose of forestalling his judgment against any friendly advice that might be given him on the subject, as the defendants well knew that the price which he had agreed to pay for it, was exorbitant and far greater than it was actually worth, and if he should discover its true value, and the imposition which had been practiced upon him, he would immediately renounce the bargain and take the proper measures to rescind the contract. That he removed to the farm in August 1868 and on the seventh of that month took a deed for it from him, paying him at that time seven thousand dollars in addition to the one thousand before paid him upon it, and made and executed to him a bond and mortgage on it to secure the deferred payments of the purchase money, which amounted in the aggregate to fourteen thousand dollars payable as follows: four thousand on the 1st of April 1869, one thousand on the 1st of January 1870, and one thousand on the first day of January in each year thereafter with the accruing interest, with the condition incorporated in the bond and mortgage that if default should be made for sixty days in the payment of any instalment, the whole balance then unpaid should become due and payable forthwith, and the defendant might proceed by due process of law to collect it. But that no such con-

dition was in the original contract, and was no part of it, but was inserted at the instance of the defendant and in fraud of the agreement. That as soon as he discovered it, he enquired what it meant, and objected to it, but the defendant said it was only a matter of form, and that he did not mean to take any advantage of it, and if he should not have the money when any of the payments became due, they (meaning himself and this complainant) could get the money of the Bank of Smyrna to meet it, in consequence of which assurances and profession of friendship and kindness on his part, and especially upon his assurance that he would take no advantage of that condition, he executed the bond and mortgage as so drawn.

But not being prepared to pay the instalment of four thousand dollars with interest when it became due on the 1st day of April 1869, the defendant on the 26th day of the same month caused an execution to be issued to the sheriff of the county on the judgment entered upon the bond, and afterward a writ of *scire facias* on the mortgage to foreclose it, returnable to the October Term of the Superior Court in that year; and that under the coercion of the execution, and to prevent the threatened sale of his personal property on which it had been levied, and in ignorance of certain material facts hereafter to be stated, he paid in the month of August in that year, four hundred and fifty dollars to him, making in all, eight thousand four hundred and fifty dollars which he had paid him of the purchase money, the balance of which was thirteen thousand five hundred and fifty dollars with interest upon it, and that it was after the last payment made of four hundred and fifty dollars, the defendant caused the writ of *scire facias* to be issued on the mortgage with the view and for the purpose, as he believed, of regaining the possession of the farm and the legal title to it, and so to defraud him out of the money he had thus paid on it, inasmuch as it was not worth and would not sell for more than the balance of the purchase money remaining unpaid upon it. That since his

removal to this State and within the present year, he had learned that the price which he had agreed to pay for it was excessive and exorbitant, and that at the time when he purchased it, the farm was not worth more than fifteen thousand dollars, and has not been since, and would not now sell for more than that sum, if sold on time, nor near so much as that, if sold for cash. That the defendant had not made on it the year before, as he had falsely stated to him, four thousand dollars, nor even three thousand dollars, nor had he expended five thousand dollars in improvements upon it, as he had also falsely represented to him, or even, one-half of that amount, and that he never was offered twenty-five thousand dollars for it after he had bargained to sell it to him, and the said letter so informing him was false and a trick and a deceit of the defendants to induce him to believe that he was obtaining a good and advantageous bargain in the purchase of it, and to close his ears against any suggestions from others to the contrary, which they apprehended might be made to him, and that they would be thereby prevented from selling it to him at such an exorbitant and unconscionable price. That he had in vain formally applied to him and besought him before filing the bill, to avoid litigation, and as an act of mere justice to him under the circumstances, to make some abatement and reduction in the price agreed to be paid for the farm, but which he had refused to do, and had proposed to him to take the farm back and refund to him $5500, of the purchase money already paid, and he would cheerfully lose $3000 on it; but which offer he had likewise refused. That by the original contract of sale the defendant covenanted to give him a deed of general warranty for the farm with the usual full covenants, and free of all incumbrances; but he had within a few days discovered for the first time, that the deed executed by him contained neither a general or special warranty, and no covenants whatever; and that there were at the time of the delivery of it, and still were, liens against the farm on he records of the Superior Court in and for the county,

discovered on a partial examination, to the amount of over eleven hundred dollars. And that by the contract of sale it was also agreed that the complainant was to have the landlord's share of the crops then growing upon the farm, but before he had left it and he, the complainant, had moved on it, he had carried off a part of said share of the crops, and appropriated them to his own use without the knowledge and consent of the complainant.

The prayer of the bill was that the sale might be entirely rescinded, and the portion of the purchase money paid by the complainant might be refunded to him, on his reconveying the farm to the defendant; for an injunction against further proceedings on the judgment and mortgage, and the *scire facias* and execution thereon, and for a preliminary injunction to issue forthwith to stay proceedings in the meanwhile, and for general relief.

The defendants in their answers stated that neither of them had any acquaintance with, or knowledge of the complainant, until his first visit to Clayton early in the spring of the year of 1868, for the purpose of purchasing a farm in the State, although he had prior to that occasion been as far down as Camden for the same purpose, and had contracted for one in that vicinity, but which the owner had afterward declined to sell, and that he was then on his way to that section again when by a mistake of his, he was left by the train of cars in which he was travelling at Clayton, where Riggs, one of the defendants,first became acquainted with him, and who afterward introduced him, first to his partner in their business as real estate agents, McConaughy, and several months later to Garman, the other defendant. That they believed from what he had told them that he was of German extraction, but that he spoke the English language so well that no one would have supposed that he could speak any other. He then informed Riggs of the object of his visit, and on his expressing a desire to see some of the farms for sale in that vicinity, and at his own request the latter took him out to see several of them, but not the one in question, as

it had not up to that time been offered for sale, all of which he observed with care and attention, but none of which suited him; and that during the ride he said to Riggs that he had been a farmer and dealing in land ever since he had been in business for himself, and when he looked at a piece of land, he could tell what it would do better than any one could tell him, and that he would depend on his own judgment in that respect, or words to that effect. That in viewing all the farms then shown to him he manifested more than ordinary care, prudence and judgment in observing the good and bad qualities of them, and was not credulous, but seemed to rely on nothing that was said to him, unless it was confirmed by his own observation and judgment after an examination of the premises concerning which any representations had been made to him.

That he again visited Clayton some weeks later, and was taken around a second time by the said defendant to see other farms in the vicinity as before, but still finding none to suit him, he told him and his partner the kind of a farm he would like to buy, and before leaving a second time for his home in Pennsylvania, particularly requested them, if they should afterward have such a farm for sale, that they would write to him and let him know it; and it was after his second visit, and shortly before the first of June 1868, that the farm in question was put in their hands for sale by Garman, the other defendant, when they wrote to him, on or about the first of that month a letter describing it and inviting him to come and see it, and at the same time sent him one of their printed general circulars, and which letter they supposed to be the same that was first referred to in the bill of complaint, for they had retained no copy of it, and had not seen it since it was mailed to him; but it was written and sent to him without the request, and without any knowledge whatever of it on the part of Garman, the owner of the farm, and solely because of his own request, as before stated, and their own supposition that it might suit him. The statement contained in

it that the farm had yielded in products the preceding year as much as four thousand dollars in value at the prices then prevailing, from the information which they had in regard to them, they believed to be true when they wrote the letter, and they believed so still; and no false or fraudulent representations were made by them, or intended to be made by them in it. That in a short time after it was written the complainant again visited Clayton, and soon after his arrival there by his own request he was taken out by them to see the farm for. himself, and where he for the first time met Garman, and was introduced to him, and where he spent two or three hours in walking over and viewing it with particular attention and observation in company with all of the defendants. The corn was then knee high, and there was wheat and clover growing on it. He said the soil was good, and Garman then stated to him that the products of the farm the previous year were worth four thousand dollars, and also that he had expended in all between four and five thousand dollars in improvements upon it; and when asked by the complainant after he had completed his examination of it, what he would take for the farm, he .replied to him that he would take twenty three thousand dollars for it, but in response to which the complainant made no further remark, until he and the other two defendants were about leaving it to return to Clayton, when he said to him that if he would take twenty-two thousand dollars for the farm, meet him at Clayton when he came back from Camden, and he would take it, or words to that effect. The other defendants had said to the complainant that they considered it at the time the best and cheapest farm they had for sale, and considering the improvements which had been made upon it, and its location so near the railroad station at Clayton, and the price of produce at that time, they then believed and still believed it was so. On his return from Camden to Clayton a few days afterward, Garman was not there, and he thereupon requested McConaughy, one of the defendants, to ride out to the

farm and bring him into Clayton which he did in accordance with his request, when an agreement for the sale of it was entered into and executed by him and the complainant in the office of the other defendants. That a letter was afterward written by the latter to the complainant about the thirtieth day of July 1868, informing him that Garman could have got twenty-five thousand dollars for the farm, if he had not sold it to him. It was not written however, at the instance or suggestion of Garman, or with any privity or knowledge of it whatever on his part, but in compliance with another request made by him before leaving again for his home on the occasion last mentioned, that they would keep him advised of any thing occurring in the neighborhood. They had retained, however, no copy of the letter, and could only speak from imperfect recollection of its contents; and in their belief the farm was worth at that time the price he had agreed to pay for it.

In addition to the foregoing Garman's answer stated positively that the crops of the farm the preceding year were worth in the aggregate four thousand dollars, at least, and that he had expended from time to time in lime and fertilizers, in draining, planting hedges, apple, peach and pear trees, erecting buildings, fences and otherwise, between four and five thousand dollars; and that he would not have sold it at the time to any other person for' less than the price the complainant agreed to pay for it, as he considered and believed it to be worth that much money. That the complainant had frequently expressed his entire satisfaction with the purchase and the price he was to pay for it, before and since he had taken possession of the farm, and was never heard to complain of it, or to express any other opinion in regard to it, until he made default in the payment of the first instalment of the purchase money secured by his judgment bond and mortgage upon it. That on the same day on which he executed and delivered the bond and mortgage to secure the deferred payments of the balance of the purchase money, amount-

ing to fourteen thousand dollars, he also executed and delivered to him his judgment bond for one thousand dollars, which he had agreed to pay him for his interest in the crops then growing on the farm, for the year 1868, he having entered into possession of it under his purchase of it in the month of August preceding, and which was not collateral to, but was wholly independent of the mortgage for the balance of the purchase money to be paid for the farm. That there was no specific provision in the agreement of sale that the bond and mortgage for the deferred payments of the balance of the purchase money should contain the condition referred and objected to in the bill of complaint, to the effect that a default in the payment of any instalment should work an entire forfeiture of the bond and mortgage, but that he was fully apprised and advised of such condition, and of the operation and effect of it by the counsel for Garman, who prepared and drew the instruments, several hours before he executed and delivered them, on his own special inquiry in regard to the matter; and that the defendant never said to the complainant that such a provision or condition was only inserted in them as a matter of form, or promised him, if at any time he should make such default, that he the defendant, would not take any advantage of it, or that he would join with him in borrowing money out of bank to meet it; but that he had, on the contrary, from the first, informed him that he would want and would expect the money when, and as it became due and payable; and although the deed from him to the complainant for the farm was not in conformity to the stipulations of the contract of sale in respect to general warranty and full covenants as alleged in the bill of complaint, nevertheless after the deed had been read to the complainant at the same time his bond and mortgage to the defendant was read to him, and by the same counsel, the complainant particularly inquired of him if the deed was in accordance with the usual form of deeds made for lands in this State, and was informed by him that it was, when he expressed himself satisfied with it, and

several hours afterward received and accepted it without any objection to it on that, or any other ground. That the execution issued on the twenty-sixth day of April 1869, on the judgment entered on the bond for an instalment of interest due upon it on the first day of January in that year, and an instalment of interest and principal (the principal thereof being four thousand dollars) due April 1st, 1869, referred to in the bill of complaint, was issued at the instance and request and on the special application of the complainant himself, made to the defendant to anticipate the levy of another execution upon his goods which he was apprehending would soon be issued on a judgment then about to be recovered against him by the firm of Stehman, Clarkson & Co. of the State of Pennsylvania, in the Superior Court of this county, on a promissory note of his held by them, and as that was the purpose for which it was issued, it was stayed as soon as it was levied on his goods by the order of the defendant pursuant to his agreement with the complainant in regard to it, and was so returned by the sheriff. And that in fact only one incumbrance, to the amount of one thousand dollars and interest and costs, existed and rested on the farm at the time of the sale of it, and that was made known to the complainant by the defendant before the deed was executed and delivered to him, but which was not then due, and against which, by an arrangement between them (and particularly stated in the answer) had been amply secured to his entire satisfaction. The answer admitted that the complainant had applied to him to take the farm back, and to refund the money already paid on it, less two, instead of three thousand dollars, and that the defendant had refused to accede to the proposition. It also admitted the suing out of the *scire facias* on the mortgage as alleged in the bill of complaint, but denied that it was his design or desire to force the farm to a sale at a sacrifice, or to buy it and become again the owner of it.

The evidence in the case will sufficiently appear in the statement of it in the opinion of the Chancellor delivered

in his Court, dissolving the injunction, and dismissing the bill, so far as it prayed for relief by the rescinding of the sale.

WALES, J., in the absence of BATES, CHANCELLOR, and by his request, read his opinion delivered in the case in the court below:

It is a rule well settled that after the parties to a contract for the sale of lands have gone so far as to execute the contract by the conveyance of title, the transfer of possession and the payment or securing of the purchase money, this court will not unravel the transaction merely to relieve against the hardship, or, even, great injustice of an unequal bargain. A contract executed will be set aside only where either, 1st, there has been a mistake materially affecting the subject matter of it, and with respect to which the contract cannot be reformed; or, 2d, where the contract has been procured by fraud in some of its forms of misrepresentation, circumvention, or undue influence.

The present case goes upon the ground of fraud. It is alleged that this was an exorbitant bargain procured through fraudulent misrepresentations and arts practiced by Garman and the other defendants in concert upon a weak and credulous purchaser mentally incapable of protecting himself. Such is in substance the case made by the bill. This charge of fraud was, in the argument for complainant, sought to be maintained upon two general grounds. Each of them has received a distinct and careful consideration. The first of these grounds is the alleged gross and fraudulent misrepresentations by Garman as to the value of the improvements made upon the farm, and the income received from it for the year 1867. The allegation on this point is, that pending the negotiation in June 1868, and while the farm was under examination by the complainant, Garman as an inducement to the the purchase, represented 1st, that he had put upon the farm improvements " to the amount and value of $5000;" and 2d, that " he had made $4000 off it the year before." The bill then denies that Garman had made improvements

to more than one half the amount of $5000. It also denies that he had made off the farm $4000, or even $3000.

The first step in the investigation of this charge should be to ascertain precisely what were the representations which, according to the record, Garman must be taken to have made. Let it be here observed that no person other than the parties to this bill, viz: the complainant, Garman, McConaughy and Riggs, were present during the negotiation in the course of which the statements by Garman as to improvements and income are alleged to have been made; nor is there proved any admission on the part of either of the defendants as to what transpired during that interview. The whole transaction rests in the bosoms of these parties, and we have in the cause no disclosure touching any representations made by Garman, except the allegations of the complainant in his bill, and Garman's counter-statement in his answer. McConaughey and Riggs in their answers are silent on this point. Garman's answer not being made to interrogatories filed with the bill is not, under the recently adopted rules of court, evidence in his favor; yet it may be used by the complainant against him as an admission in the cause so far as it may go to support the complainant's allegation; and it is only by using Garman's answer on this point as an admission that the complainant can draw from the record any proof whatever as to the representations made by Garman during the negotiation. It is hardly necessary to add, that Garman's statement, if used as an admission and is uncontradicted by evidence, must be accepted as it is made.

This result obliges the Court to one of two alternatives, that is, either to dismiss from consideration, as wholly unproved, the alleged false representations touching the improvements and income of the farm, or to consider this allegation of the bill upon the assumption that the representations made were such as Garman's answer states them to have been. This leads directly to what is the only admissible inquiry under this branch of the case, viz; how far the evidence as to the value of the improvements

and the amount of income supports the representations which Garman admits that he made on these points. And first, as to the improvements. Garman admits his having stated to the complainant that improvements had been made "to the value of between $4000 and $5000." To what extent then were improvements made in 1867 ? The testimony at large shows that fruit trees were set out, new fences set and the old repaired, lime · extensively spread and other fertilizers used, that there was ditching and underdraining, a new carriage house and stable built, the dwelling house repaired and the grounds improved. The fact that these improvements were made is not disputed. It is their amount and value that is in controversy, and about which we proceed to inquire. Let us premise the inquiry by a very material and obvious consideration. It is that for the purposes of this cause the amount and value of these improvements need not be so exactly ascertained, as would be necessary in an action to recover their cost ; but rather the question is, whether Garman's representations were so wide of the truth as not to be accounted for by the usual disposition to over-estimate the value of one's own property, especially the value of improvements attempted upon any considerable scale, a disposition stimulated, it may be, to some exaggeration by the effort to drive a good bargain ; in other words, whether there were over-statements so gross as to be attributable only to a fraudulent design to cheat and over-reach. I am not able upon the proof to reach this conclusion. After collating the testimony of all the witnesses as to the several items of improvement and calculating their cost, it does appear that their total cost could not have fallen much, if any, short of $4000. If this be so, then a statement by the vendor made in driving a bargain, to the effect that he had improved to an amount of from $4000 to $5000, though somewhat exaggerated, cannot be treated as willfully false and fraudulent, such as to lay a ground for rescinding the sale.

We next take up the other alleged fraudulent misrepre-

sentation, the one touching the income for 1867. Garman admits that pending the negotiation, he did say to the complainant that "during the preceding year (1867) he had produced from the farm crops which in the aggregate had amounted to $4000." The difference on this point between the bill and answer is doubtless as to the sense in which the word "made" was used; whether the statement that Garman had "made" $4000 off the farm," applied to the gross value of the produce, or to the net income of the business of the year. The latter construction, which is that given by the bill, is unsupported by any evidence. The only evidence adduced, Aaron Wiest's testimony, falls short of it. He says, "I heard Randall B. Garman tell my father, George Wiest, that he made $4000, off the farm in 1867." Four thousand dollars was the net value of the crops. I heard him tell my father so." The date of this conversation here becomes material. It is fixed by the cross-examination. "He told my father" says the witness, "the farm was very good and that he (Randall B. Garman) made $4000 from it in one year, viz: 1867, clear of all expenses." "This conversation" the witness proceeds to say, "occurred in 1868, in the month of August in the afternoon." This in the words of the witness, is the whole testimony as to what Garman said at any time on this subject. I am unable to accept it as proof of this allegation of the bill: First, because it does not go to the time of the negotiation, which was in June. The witness speaks of a conversation held in August after the purchase had been made. Such representation then made is not in accordance with the allegation, and what is of more consequence, it could not under the rule of law be material; for a false representation in order to be ground for rescinding a sale, must have been made before the sale, and have been an inducement to it. Nor, again, can the fact that such a representation was made in August, after the purchase, support an inference that a like statement had been made previously in June, pending the negotiation. It would be dangerous in the extreme to subject executed

sales of real estate to the risk of being set aside upon inferential evidence so slender as this. Thus appears the insufficiency of this evidence even supposing Aaron Wiest to have correctly understood Garman's meaning. But here arises a second observation to which this testimony is open, and that is the inherent infirmity of testimony which does not concern some act or transaction about which the witness could not be supposed to be mistaken, but which rests upon the witness' impressions as to the terms or purport of a conversation, a conversation held, as in this case, eighteen months ago, and on a point so liable to misconstruction as whether Garman, speaking of the productiveness of the farm, referred to its gross produce or to its net income. Without questioning in the least degree Aaron Wiest's veracity, I should be unable if the case depended upon it, to accept his impressions of that conversation, standing alone as his testimony does, as evidence of that clear and satisfactory nature which is necessary to warrant so serious an interference of the Court as is the setting aside a contract deliberately executed, such as this has been.

There remains then to the complainant, as his only means of showing that any representations as to income were made pending the negotiation, Garman's answer used as an admission. It goes to this extent, that he represented the value of the crops produced in the year 1867 at $4000. Then the only inquiry open to us is, how far does the evidence sustain this admission by Garman? Let us see. Dougherty who measured and delivered the corn crop and took receipts for it, puts it at nearly 2200 bushels. He is corroborated by B. F. Hurlock, who helped get out the corn, also by J. A. Hurlock who bought part of it, 1700 bushels, at $1.00 per bushel. Crawford, the complainant's witness, estimates that there were 1800 bushels raised. The positive statement of the measurer must be preferred to any estimate. This gives at least 2100 bushels, which being sold at $1.00 per bushel was worth $2100. Dougherty also measured the other crops,

the wheat crop at 550 to 560 bushels, say 550 bushels; the oats at 250 bushels,and the potatoes at 260 bushels. The wheat was sold at $2.50 per bushel, the potatoes at 85 cents. What the oats sold for does not appear, but the market price at the time Hurlock states as 60 cents. Taking these quantities and prices, the gross value of the products of the year was $3846.50,falling it is true, a little short of $4000; yet certainly not sufficiently so to stamp as fraudulently false a statement by Garman that the crops had amounted to $4000. This is the extent of his admission in the answer and nothing beyond this is proved. The conclusion to which this examination of the evidence leads, is that the alleged fraudulent misrepresentations touching improvements upon the farm and its income are not proved.

But again, even supposing that Garman's representations to the complainant as to the improvements and income were more in excess of the truth and formed a material inducement to the purchase, this would not be ground for a decreee rescinding the sale. In the course of the decisions touching misrepresentations by vendors in a bargain, two distinct classes are recognized with different effect. First, are those which concern the essence or subject matter of the contract; as for example, a representation that the property contains a valuable gold mine, when in fact there is none. Against a misstatement of this nature, whether it be the result of fraud, or only of mistake, Equity will relieve : and this because the purchaser does not get the thing which he contracted for ; of this class were the cases cited for the complainant from 2 *Paige's R.* 390, *Livingston v. The Penn Iron Co.* 3 *Paige's R.* 313, *Wiswell vs. Hall,* and *Rosevelt v. Fulton,* 5 *Johns. Ch. R.* 174. 2 *Cow.* 129. The other class of representations are those which concern not the essence or subject matter of the contract, but the value of the property sold; such as the usual commendations made by the vendor, and rarely without exaggeration, touching the fertility, productiveness, improvements, income and general advantages of the property. Representations of this nature a purchase'

is not presumed to rely upon. If material at all, they should put him upon examination or inquiry: and the omission of a purchaser to exercise his own judgment in such matters upon examination or inquiry, or to seek disinterested advice, should his own experience or judgment not be reliable, Equity will not relieve against; that is, observe, not so far as to rescind a sale already executed. To this rule there are some exceptions. These are where, under special circumstances, an examination of the property is very difficult, or the misstatement concerns a matter of peculiar skill and judgment on the part of the vendor, or there is an abuse of confidential relations between the parties dealing, or imposition upon a mental capacity too feeble to bargain. In these exceptional cases, and I have endeavored to comprehend all, Equity excuses the purchaser's reliance upon the vendor, and his omission of the usual precautions for self protection; but otherwise, the maxim *Caveat emptor* applies to all such representations by a vendor as relate to the value, quality and advantages of the thing sold. For illustrations of this rule take a few of the adjudged cases in which relief has been refused. In *Fenton v. Brown*, 14 *Ves. Jr.* 144, a leasehold estate offered for sale was stated to be nearly equal to a freehold, being renewable upon a small fine. It turned out that the lease of the premises being held of Magdalene College, Oxford, was renewable only at the discretion of the College, by which a large fine (£700.) was demanded. In *Scott v. Hanson*, 1 *Scin.* 13, the land was described as "uncommonly rich water meadow land," whereas it was imperfectly watered. In *Taylor v. Fleet* 4 *Barb. N. Y. Repts.* 95, the misstatement charged in the bill was that a farm on Long Island was full as early, if not earlier, than any other land on the west end of Long Island for raising market produce, which was the object of the purchaser. It turned out that there was earlier land on the Island. There was some contrariety of evidence as to what were precisely the vendor's statements, but the Court held that, at all events, these were not such representations as a purchaser should

rely upon without examination and inquiry, and that his disappointment was not a sufficient ground to rescind the sale. A case more striking, and in its facts much like the present one, is *Tindall v. Harkinson*, 19 *Ga.* 448. The bill charged that Tindall desiring to invest in lands, and being inexperienced, applied to Harkinson for truthful information as to his lands, which Harkinson promised to give. After showing Tindall a portion of the lands, Harkinson assured him that the rest was equally good; that he had made 40 bales of cotton that year (1853); that the land yielded 800 to 1200 lbs. of cotton per acre, and 15 to 20 bushels of corn; that land in the neighborhood sold for $14 per acre, the price he asked for his; that it was a lively, thrifty soil and well remunerative; all which statements Tindall confided in, and bought the land at $10 per acre. The bill charged falsehood in all these statements. The case came up on a motion to dissolve an injunction after answer filed denying the charges of the bill; but the Court distinctly considered the sufficiency of the bill on its face and expressed a strong opinion against it.

The cases cited for the complainant, such of them as were accessible, have been examined. They range themselves clearly within the exceptions before referred to, in which the purchaser is excused from diligence. In some of them there were confidential relations between the parties, as in *Pinkston v. Brown*, 3. *Jones Eq.* 494. *Hunt v. Moore*, 2 *Barr* 105. In one, *Corneilius v. Molloy*, 7 *Barr* 293, the misstatement related to a matter depending upon skilled judgment, and not discoverable by inspection, it being a sale of composition metal represented to be copper. Others, such as *Jackson v. Summerville*, 1 *Harris* 359, were cases of imposition upon extreme old age and imbecility, and in that case this was connected with gross inadequacy. The case most relied on for the complainant was *Irving v. Thomas*, 18. *Me.* 418. A lessee of a tavern took the lease at a high rent under a misrepresentation by the owner as to the profits of the business. He paid part of the year's rent, and being sued at law for the balance,

defended upon the ground of fraud. The court sustain the defence. They do so however with this express qualification, that the misrepresentation would not have been a sufficient ground to set aside the lease, so as to enable the lessee to recover back what he had paid, but that it served only as a defence against any further claim for rent.

It is very material to a right decision as to the effect of fraudulent misrepresentations by a vendor touching the property sold, whether lands or goods, to observe how the question comes before the Court, whether the fraud be used as a defence in a suit at law for the price, or as the ground of an action for deceit; or if in Equity, whether the bill is for the specific performance of a contract yet unexecuted, or as here, it is a bill to rescind a contract which has been executed. It is in this last class of cases that Equity so stringently applies the maxim *caveat emptor*; a hard, stern maxim, but one founded upon both justice and policy; upon justice, because a purchaser, who is not within the exceptions before stated, may reasonably be required to exercise the ordinary means of self protection before asking the aid of the law to undo his bargains; and a maxim of sound policy also, since without it business dealings must become greatly unsettled.

To return to the case before the Court. The evidence upon the record discloses nothing which can excuse a purchaser from forming his own judgment by personal inspection as to the improvements which Garman had made, or by inquiry as to the productiveness of the farm. The means of doing so were accessible. No artifice to prevent examination or inquiry is in proof. To some extent, the subject was one upon which the vendor must be supposed to be more accurately informed than others could be, yet there was no question of peculiar skill or experience involved, such as any purchaser of ordinary intelligence could not by reasonable care judge of, so as to protect himself. Again, there were no confidential relations between these parties to warrant a reliance upon Garman's

sole statement; and finally, and what perhaps is the more material point in this cause, I am unable, as the sequel of this opinion will more fully show, to find from the evidence such a degree of mental incapacity on the part of the complainant,as to exempt him from the ordinary diligence required of purchasers who seek the aid of this Court to set aside their contracts.

We now come to the other general ground upon which in the argument the charge of fraud in this contract was maintained. It was insisted that although no direct acts of fraud, such as misrepresentation, circumvention, or imposition might be disclosed in proof, that nevertheless the making of so unconscionable a bargain as this is alleged to be, with a weak and credulous purchaser, is of itself fraudulent and a ground of relief in Equity. It is true, that although for mere inadequacy of consideration, without other circumstances, a contract executed will not be rescinded, yet an unconscionable bargain made with a person of such weak understanding as to be incapable of self protection, though not an idiot or a lunatic, raises a presumption that it was procured through some fraud or undue influence ; and on this ground Equity will relieve such a person against a transaction which would bind one of ordinary capacity, exempting him from the maxim *caveat emptor* before considered. It is however material to observe that the Court interferes in this class of cases with great caution, and only where the mental weakness is to such a degree as disables the party for self protection is clearly made out in the proof. This I gather as the result of the authorities. It is unnecessary to review them. *Shelford, on Lunatics,*1 *Law Lib.*(267.) 1. *Fonblanque's Eq. B. I. Ch.* 2, *Sec.* 3, *n.* (2). 1 *Story Eq. Sec.* 235. 6. *Clarkson v. Hanway,* 2 *Pr. Wms.* 202. *Bennett v. Vade,* 2 *Atk.* 324. *Gartside v. Isherwood,* 1 *Bro. C. C.* 558. *Blackford v. Christian,* 1 *Knapp,* 77, cited in 2 *Sto. Eq. sec.* 237. Of this class are the cases cited for complainant from 4 *Sneed* 498. 8 *Humph.* 145 27 *Ga.* 444, and 19 *Tex.* 390.

Unquestionably the bargain in this case is a hard and

improvident one; but is the complainant a person of such weak understanding as to bring him within the principle of these authorities? The opinions of the complainant's witnesses, who are numerous and respectable, do go to the extent of holding him wholly incompetent for any serious business transactions. But the opinions of witnesses upon a question so uncertain as that of mental capacity, is not a safe, nor a sufficient ground for judicial action of so grave a nature as is here sought, unless these opinions be well supported by the facts entering into the history, acts and transactions of the person whose capacity is in question. A degree of mental incapacity for business, such as should exempt one from the ordinary requirements of diligence and precaution and justify the court in undoing his transactions, must have shown marked results in his past business life. Either the affairs of such a person will be found to have slipped out of his hands and have come under the management of others, or his own management, if allowed to continue, must have been attended with disaster beyond the making of one improvident bargain. Again, such a degree of incompetency could hardly fail to have left traces of itself in his mode of dealing in the particular transaction inquired of. Now, I am not able by these tests to find the complainant incompetent to the degree required. In the first place, the complainant during more than half an ordinary lifetime has been in active business, pursuing several avocations, farming, milling and merchandizing, in all which he has managed his own affairs, and although doubtless not with as much wisdom or thrift as have many or most others in his sphere of life, yet without any marked failure or miscarriage, except that as testified by one witness, he lost money at storekeeping which a farmer, or miller, however competent for his own business, is very likely to do. And through all he has reared a family, maintained a fair status in society and, until this purchase, accomplished if not any marked success, yet not a failure in business life. In the next place, looking to this purchase and to

the circumstances attending it, we do not observe in his acts and mode of dealing the marks we should expect to find of signal incapacity to bargain. In carrying out his purpose to buy lands in Delaware, he acted deliberately, made several visits, not less than three, to Delaware, visited lands in both Kent and Sussex counties, examined three farms near Camden, and contracted for one on terms not so hard upon himself but that the vendor, McBride, retracted. In the negotiation with Garman, even taking the statement of the bill, there was not betrayed undue haste, excitability or extreme credulity. He personally examined the farm, formed a judgment upon it, good or bad, and, as the circumstances of the case indicate, he made his offer, left, returned in a few days from below, found his offer accepted and closed the bargain. In all this there appears nothing but what ordinarily attends such transactions, even if we include a no small anxiety on the part of Garman to sell, and of the land agents to forward the sale. It is also a noticeable and significant fact that throughout the complainant's efforts to buy land in Delaware, and especially during the two months which elapsed after the purchase from Garman before it was completed, no interest, anxiety or interference appears on the part of his friends to see that he might not be imposed upon.

But now we come to the unhappy feature of this case, one which more than all besides, has brought into question the complainant's mental capacity. That is, the exorbitant price at which he bought. It is evidently upon the folly of this purchase that the witnesses have formed their opinions. The most emphatic among them—the Delaware witnesses—could have nothing else to rest upon, for they have known him in no other transaction. Their opinion is based upon the assumption, that the price was about double the value of the farm, their average estimate of the farm being $12,000, against a price amounting to $22,000.

Now, it is certainly true that in all cases in which the question of fraud, undue influence, or incapacity is raised,

inadequacy of consideration is a material element ; that is by it proof on these points which otherwise would be doubtful, may be rendered decisive. In a case where the capacity of a party to bargain is left in doubt, the very exorbitancy of the bargain may convince the court that the party must have been unfit to transact business, and have become the dupe of some imposition. But to have this effect the inadequacy must be gross. 1 *Sto. Eq : Sec.* 246. The bargain must be as described by Lord Hardwicke in *Chesterfield v. Jansen,* 2 *Ves. Sr.* 155, "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair minded man would accept on the other"; or as Chancellor Kent puts it in *Osgood v. Franklin,* 2 *Johns. Ch. R.* 23, "such as to shock the conscience and confound the judgment of any man of common sense." In all the cases in which inadequacy of price or value has been treated as a material consideration, it has been of this gross character. The inequality has not been less than half the value, the English and American cases seeming practically to apply what in the civil law was an artificial rule on this point. In the cases cited for the complainant there was in none no less disparity than one half the value, in many of them much more. For example, in *Stewart v. Hubbard,* 3 *Jones Eq.* 186, sixty dollars was paid for a share in an unsettled estate, the share being worth $1200. In *Brooke v. Berry,* 2 *Gill,* 84, three thousand seven hundred dollars was the consideration for land valued by the Court at six thousand five hundred and twenty dollars. In *Bruch v. Smith,* 15 *Texas* 219, two hundred and fifty dollars was the consideration for a widow's interest in an unsettled estate of her husband worth eighteen hundred and seventy three dollars and fifty seven cents. Now to apply this test to the present case ;—it is true that the complainant's witnesses estimate this farm at an average value of only $12,000, which is but little above half the price paid, $22,000. But their estimates manifestly do not include the improvements put upon the farm in 1867, at a cost clearly proved of hardly

less than $4000. The witnesses, 14 in number, being cross-examined as to these improvements, six profess to know nothing about them, and six more speak of them very partially and express themselves as unable to set a value upon them.

Two of them, Crawford and Ross, undertake to estimate the value of the improvements, but at a value much below their proved cost, not equal to half of it. It must be fair to assume that from 1866, when Garman bought at $11,000, to 1868 when he sold, the enhanced value of the property in consequence of improvements, was at least equal to their cost, say $4000; and as upon the testimony of all the witnesses, prices of real estate had not begun to decline in the summer of 1868, it may be considered that in June 1868, this farm had a market value of from $15,000 to $17,000; that is, estimated according to the prices and expectations which then prevailed, and not under the depression which afterward followed. Then the question remains, and it is the final and decisive one, is this so gross a disparity of value as can be accounted for only on the ground of imposition upon mental weakness, so as to be, as the phrase goes, "demonstrative" of incapacity and fraud? I conclude it is not, but rather that the case must be treated as one of the unfortunate fruits of the speculation in real estate prevalent in this State for some years, and which culminated at about the time of this sale. All have seen, and not a few have felt its effects. The ordinary and reliable valuations of real estate resting upon sober calculations as to productiveness and income, gave place to fanciful and false estimates based upon exaggerated prospects of advanced prices destined never to be realized; and these again by a natural law are succeeded by depression and a decline of prices quite below the real value. Our own people largely fell under this influence, and immigrants from other States much more so. Now, there are in every community—we may see such any day—persons inexperienced, ill judging, over-sanguine and visionary, who in these periods of inflation fall into rash and

improvident bargains. Such cases appeal strongly to our personal sympathies, but in the absence of fraud the law cannot relieve against these follies. To do so would largely unsettle the business of society.

*Fulton*, for the appellant. A seller is held to a stricter rule in regard to his representations than a buyer, and the former should be strictly bound to disclose the real nature of the subject of the contract. The strong leaning of the courts is properly against the seller. Because he ·is presumed to know all about it, and the buyer usually confides in his representations. *Sug. on Vend., Chap. 1, Sec. 3.* The owner of an estate is supposed to be peculiarly cognizant of its quantity and quality; and a person coming to purchase or lease, naturally and properly looks to him for information and has a right to expect the truth from him. *Mitchell v. Zimmerman*, 4 *Tex. Rep.* 75. In the present case the application for the relief sought, is in time. In *White v. Lightbourne*, 2 *Bro. Parl. Cases*, a deed which had been executed eighteen years before, was set aside for fraud ; and in *Gould v. Okeson*, 3 *Ibd.* 560, a deed for the same reason was set aside after the death of the grantor and the lapse of twenty years from the time of its execution. And deeds may be set aside for deception and fraud at any time. *Irvine v. Kirkpatrick*, 3 *E. L. & E. Rep.* 17. For in cases of fraud, every day it remains undiscovered, is but a repetition of the· wrong. *Adams Eq.* 176. Fraud is a valid defence at all times. *Hopkins v. Beard*, 6 *Cal. Rep.* 664. Where a defendant did not admit the justice of the claim, but said he would rather pay than go to law, and after making his last payment on the purchase, asked further time upon the balance, it was held by the court that he was not estopped from showing that nothing was due on the ground of fraud. *Mitchell v. Zimmerman*, 4 *Tex.* 75. And time will be allowed a purchaser to ascertain whether the representation of the seller is true or false. *Winslow v. Bailey*, 16 *Maine* 319.· A party cannot be justly re-

garded as voluntarily confirming a contract believed to be fraudulent, because he did not repudiate it upon a violent presumption of fraud, but waited until it was clearly shown in time that it was a fraud. *Irving v. Thomas*, 18 *Maine* 418.

The rule of *caveat emptor* does not apply in cases of fraud; for fraud constitutes an exception to every rule. *Sug. on Vend.*, Chap. 2, Sec. 11. It does not apply where one party enters into the contract by reason of the false and fraudulent representations of the other; and this principle extends even to public and judicial sales tainted by such representations. *Mitchell v. Zimmerman*, 4 *Tex.* 75. *Irving v. Thomas*, 18 *Maine* 418, *Crayton v. Munger*, 9 *Tex.* 285. A conveyance was set aside where it appeared that the vendor had acted upon the misrepresentations of the vendee, and the latter was not allowed to prove that all but one of his representations were true. *Reynell v. Spye*, 13 *E. L. & E. Rep.* 74. A misdescription of distance, as where the property was described as about a mile from Horsham, and it was between three and four miles from that place, was held to entitle the purchaser to a recision of the contract, or to compensation for the difference. So where a house was described as a brick-built dwelling, and it was built of brick and timber, the contract was not enforced. *Sug. on Vend. Chap.* 1, *Sec.* 3. Where a purchaser has, by mistake, given an unreasonable price for an estate, the court will in a proper case wholly rescind the contract. *Ibd. Chap* 2, *Sec.* 3, 2 *McCord's Ch.* 159. A purchaser has a right to rely upon the vendor for the number of acres, and may and usually does place implicit confidence in his statements, and that he was a neighbor and had been over the farm many times makes no difference in a case of such misrepresentation. *Course v. Boyles*, 3 *Green's Ch. Rep.* 149.

But executed, as well as executory contracts when procured by fraud, are relievable against in courts of equity; and, even, a decree after enrollment may be opened for fraud. *Adams' Eq.* 397. And fraud and collu-

sion even in a sale made by order of the court, will entitle the party defrauded to have the confirmation taken off. *Sug. on Vend. Chap.* 2, *Sec.* 3. The deed of an ignorant and illiterate party has been set aside, although read to him, there being no proof that he fully understood the import and effect of it. *Price v. Price,* 12 *E. L. & E. Rep.* 144. Relief may be granted after deed executed. *Hayes v. Doan,* 3 *Stock,* 84. And a decree of court founded on a fraudulent deed will be set aside and annulled. *Jackson v. Summerville,* 1, *Har.* 359. And it is clearly settled beyond controversy, that a court of chancery will decree a return of the purchase money for insufficiency of title, even after the purchase has been carried into execution by delivery of the deed and payment of the money, and whether the deed was with or without covenants, provided there had been a fraudulent representation as to the title. *Moreland v. Atchison,* 19 *Tex.* 303. The original terms of a bargain are not necessarily merged in the instrument employed to give it effect. *Tyson v. Passmore,* 2 *Barr* 122. The court may resort to the previous agreement to ascertain what the parties meant, in order to carry that into execution, even after deed passed. *N. J. Zink Co., v. Boston Franklinite Co.,* 2 *McCarter's Rep.* 418. So, false and fraudulent representations as to the value, income, improvements, or incumbrances of the estate will have the same effect, and do not come within the rule that the party making them is not responsible for the deception, by reason of its being a matter which may, or should be known to both of the parties. *Sug. on Vend. Chap.* 1, *Sec.* 3, *Irving v. Thomas,* 18 *Maine* 418. And when in such cases the question of fraud arises, the price is a material and important consideration, for if the inadequacy be gross and manifest, and such as to shock the conscience, as it has been said, the court will even infer fraud and misrepresentation in the matter. *Adams' Eq.* 79. But though not of itself, perhaps, conclusive evidence of fraud, it always has its proper weight with other circumstances in determining the question.

*Hayes v. Doan*, 3 *Stock.* 84. *Stewart v. Hubbard*, 3 *Jones* 186. *Brooke v. Berry*, 2 *Gill*, 83. *Burch v. Smith*, 15 *Tex.* 219. Great inadequacy of price paid for lands as compared with their actual value, is sufficient to put the purchaser on notice of a fraud by his vendor. *Argenti v. San Francisco*, 6 *Cal.* 677. Inadequacy of value although not enough of itself to avoid a sale, is yet of great weight when coupled with circumstances of oppression in order to procure it. *Cockell v. Taylor*, 15 *E L. & E. Rep.* 101.

The condition and relative capacity of the parties contracting will also be considered by a court of equity in granting relief in such cases. A simple and unsuspecting person is not to be held to so strict a rule, as a sharp and shrewd one in such cases. *Green v. Morris & Essex R. R. Co.*, 1 *Beasley* 165. The condition of the party seeking relief, the unconscionableness of the bargain, and all the circumstances enter into the inquiry when relief is sought. *Freeman v. Dwiggins*, 2 *Jones' Eq. Rep.* 162. And the court will look into the reasonableness of the transaction in order to do equity. *Stewart v. Hubbard*, 3 *Ibd.* 186. Age, infirmity, and mental weakness are elements to be considered in deciding on the validity or effect of an act. *Pinckston v. Strower* 3 *Ibd.* 494. Where the parties are not in a position of perfect equality to judge of the article, false representations of the seller will avoid the contract. *Bigler v. Flickinger*, 5 *P. F. Smith's Rep.* 279. General habit, intemperance, extravagance and thoughtlessness are all evidence in a case of fraud. *Kaufman v. Swar*, 5 *Barr* 230. The law especially protects those who cannot protect themselves; and all transactions with feeble persons, whether they are so from age, sickness or infirmity of mind are carefully watched. 2 *Pars. on Contr.* 774. *Malin v. Malin*, 2 *John's Ch. Ca.* 338. *Blatchford v. Christian*, 1 *Knapp* 77. Where one with superior information professes superior knowledge, even of the law, and thereby obtains an unconscientious advantage of another who is confessedly ignorant, and who has not been in a situation to be in-

formed, the injured party is as much entitled to relief on the ground of fraud, as if the misrepresentation were in regard to a matter of fact; and this principle is applicable to the case of an immigrant to the State, who just arrived, meets with an old citizen who professes to be familiar with the land titles of the country, and proposes to sell him land to which he assures the immigrant that he has a perfectly good title. *Moreland v. Atchison*, 19 *Tex.* 303. Although a contract made by a man of sound mind and fair understanding may not be set aside merely because it is a rash, improvident or bad bargain, yet, if the same contract be made with a person of a weak understanding, there does arise a natural inference that it was obtained by fraud, circumvention or undue influence. *Ellis v. Mathews*, 19 *Tex.* 390. Although there may be legal capacity, yet in a case of fraud, or no fraud in the procuration of a contract of suretyship, the weak capacity of the surety is a proper matter of consideration. *Causey v. Wiley* 27, *Georgia Rep.* 444. To set aside obligations on the ground of mental incapacity, it is not necessary to prove partial derangement. It is sufficient, if it appears that the mental weakness is such as to incapacitate the party from guarding himself against imposition or undue influence. *Johnson v. Chadwell*, 8 *Humph.* 148. It is not positive insanity or lunacy alone in the bargainor of a deed or other instrument of conveyance that will authorize a court of chancery to annul it on the ground of mental incapacity, but in the absence of any actual alienation of mind, if it appears that the bargainor was so imbecile of mind and infirm of purpose as to render him an easy victim of imposition and fraud, and that such influences were successfully used upon him in procuring the conveyance, a court of chancery will set it aside. *Gas v. Mason*, 4 *Sneed.* 497. *Hunt v. Moore*, 2 *Barr* 105. *Hall v. Perkins*, 3 *Wend.* 626. Fraud may be inferred from the circumstances and condition of the parties. *Belden v. Henriques*, 8 *Cal.* 87. All the cases concur in this result, that when

the misrepresentation is willful or designed, it amounts to fraud, and upon general principles of law avoids the contract altogether. *Sug. on Vend.* 40, 50. *Livingston v. Peru Iron Co.*, 2 *Paige* 390. *Wiswall v. Hall*, 3 *Paige* 313. *Rentice v. Achoon*, 2 *Paige* 30. *Havitt v. Crane*, 2 *Halst.* 159. *Rosevelt v. Fulton*, 2 *Cow.* 129. *Turnbull v. Gadsden*, 2 *Strob. Eq.* 14. And fraud may be inferred from circumstances calculated to establish it. *Kaine v. Weigley*, 10 *Har.* 179. If the party making the misrepresentations know them to be false, it was legal fraud, but if he did not know them to be false, yet made representations without knowing they were true, and they turned out to be false, it was actual fraud. *Joyce v. Taylor*, 6 *Gill & Johnson*, 54. Although fraud is not to be presumed, yet it is not necessary to prove it by positive and direct testimony; but being usually wrapt up in mystery, if well executed, it is generally by circumstances only, some of them often apparently trivial, that it can be brought to light and defeated; and on such a question any fact, however slight, if not wholly irrelevant, may be admitted in evidence. *Davis v. Calvert*, 5 *Gill & Johns.* 300, 303. And fraud may be proved by intrinsic evidence of unfairness in the transaction itself, or by evidence of facts and circumstances attending it, which by the ordinary tests by which we judge of the motives to actions, appear inconsistent with an honest purpose. *Burrh v. Smith*, 15 *Tex.* 219. Where a party intentionally misrepresents a material fact, or produces a false impression by words or acts in order to mislead, or obtain an undue advantage, it is a case of manifest fraud. It is a rule in equity that all the material facts must be known to both parties, to render the agreement fair and just; and if there be any intentional misrepresentation or concealment of material facts in the making of a contract in cases in which the parties have not equal means of information, it will avoid the contract. *Mitchell v. Zimmerman*, 4 *Tex.* 75. Fraud has been well defined to be almost always a matter of inference from circumstances. Direct proof of it can seldom be expected, for concealment

and disguise are often essential ingredients in it. It con sists in intention, which, if nefarious, will not be avowed; still it must be proved, and the question is how shall it be proved. The answer is by circumstantial evidence. The demeanor of the party implicated, the nature, tendency and effect of his acts, are to be carefully examined. A train of circumstances, sometimes more and sometimes less intimately connected with the particular act to be proved, may be presented from which inferences may be drawn as to the object and design of the person charged with having committed the fraud. *Ingersoll v. Barker*, 21 *Maine* 474. And many of the cases already cited, as well as a few more which I shall next cite, show that the proper measure of relief, and the appropriate remedy in all such cases is a recision of the contract. *Sug. on Vend. chap.* 2, *sec.* 3. 2 *McCords Ch. chap.* 159. *Coote v. Coote*, 2 *Ired. Eq. Rep.* 159. *Stone v. Denny*, 4 *Metc.* 151. *Alcarez v. Bramon* 7 *Cal.* 503.

The appellant, besides being a weak, credulous and confiding person, was an utter stranger in the State, until a few months previous to the purchase, and had no knowledge of the quality or value of land here, and both Garman and his agents, the other defendants, equally eager and anxious to sell the farm to him, deliberately misrepresented the value of it to him, the former declaring to him that he had the preceding year realized four thousand dollars from the crops of it, and had expended over five thousand in improvements upon it; and the latter more than once assuring him that at the price of twenty thousand dollars, it was the best and cheapest farm then for sale in the neighborhood, while but one witness out of the many who had been examined, had valued it as high as fourteen thousand dollars, another at ten thousand, and the others at about twelve thousand dollars at that time. As to the crops in 1867, the proof as to the amount, as well as the value of them was uncertain and conflicting. They did not, however, exceed, he thought he was safe in saying, twenty-five hundred dollars. But whatever the deficiency

or uncertainty of the proof might be on that point, it was and had been perfectly competent for Garman to show the amount almost exactly which he had expended in the improvements made by him during that year upon the premises, which, however he had made no effort to exhibit, or to prove, and the court, therefore, should and would construe his absolute silence in regard to that matter most unfavorably for him.

*Massey*, for the respondents. The case depends on two points only, namely, fraud and the capacity of the appellant to make such a contract. ' In the bill of complaint he pretends that he was induced by a letter received from McConaughy and Riggs, the agents of Garman, to come to this state and buy the farm in question, and was thus entrapped by the contrivance of all three of them into the purchase of it at the exorbitant price alleged and complained of by him; whereas, the proof is that before the date of that letter, he had been twice down into both this and Sussex county in search of a farm to suit him, and had actually contracted for two in this county, but neither of which contracts had been consummated. His boast and repeated declarations, had also been proved by several witnesses, that he was not to be cheated by real estate agents here, who asked too much for the lands they had for sale, and that he knew the value of land as well as they did, because he had bought and sold land before that time in Pennsylvania. It was also alleged and made a matter of grave complaint in the bill that after they had thus artfully drawn him into the State to make the purchase, they hurried up the sale with such impatient haste and celerity as to give him no time or opportunity for observation or reflection, or to retract the offer which he had made for it. But the testimony on that point was also equally conclusive to the contrary. For the proof was that after having taken a deliberate view of the farm, its soil and improvements and the crops then growing upon it, he said to Gordman, like a man who means busi-

ness, thinks for himself and means to waste no time making up his mind as to the exact price which he would give for it, that if he would take twenty-two thousand dollars for it, to meet him at Clayton on his return from Camden, and it would be a bargain. He immediately left without any further remarks by either on that subject, and after giving Garman three days, and himself as many, to consider and reconsider his offer, he returned from his visit to some of his Pennsylvania German friends settled in the vicinity of Camden, and where he had ample opportunity in the mean while to learn what such people think of the quality and value of lands in this county, and reached Clayton, not only still entirely satisfied with his offer, but apparently more eager and impatient than even Garman himself was, to conclude the bargain. For the latter, it seems, instead of being at Clayton every day in the mean time waiting for him, had to be sent for by him immediately on his arrival there, and the contract was then prepared and executed by them with no undue haste or precipitation on the part of any one concerned in the transaction; and the first syllable of dissatisfaction ever heard from him in regard to it was not until about one year afterward. Was there anything in this to show precipitation or undue haste on the part of either of the defendants, or of weakness and imbicility, simplicity or uncommon credulity on the part of the appellant in connection with the matter. Or that he was hastily, or fraudulently entrapped into such a bargain? But in addition to that, the appellant had sixty days after the signing of the contract to consummate the purchase, and went home and had ample time to consult his friends, and to maturely consider the subject.

The declaration of Garman that the farm had produced the preceding year crops to the amount of four thousand dollars, of course, had reference to the gross, and not the net value of them after deducting expenses, and so considered the proof had sustained the declaration. His declaration also in regard to the improvements made upon

it, of course, had reference to the cost of them in the aggregate.   The purchase and planting of a large quantity of fruit trees costs no little, while peach trees well set and in a thrifty condition, are generally valued at a dollar per-tree ; and the same remark was to some extent, applicable to hedge plants in a like condition.   The whole farm had in the meantime been dressed with lime according to the testimony of the witnesses who were best acquainted with it ; and although there was no direct evidence as to the cost of the tiles laid, or the expense of the draining done on the farm by him, it was well known to all who had any experience in such matters, that it is a very expensive operation to any one who undertakes it.   Nor was there any proof as to the cost of the gas lime put upon it. But materials and labor all taken together, an approximate estimate of four to five thousand dollars would probably not more than cover the entire cost of such improvements. As to the value of the farm, he considered the tax assess-ment of it in 1868, with the rates adopted by our county assessors, which are rarely higher than two-thirds of the actual value in assessing real estate, as fair and true a cri-terion as can be applied to it, and which it had been proved was that year thirteen thousand eight hundred dollars, and which on the basis just stated, would carry its actual value up to twenty thousand seven hundred dollars.

But where it appears that there was capacity to contract, a court of equity will not attempt to measure that capacity. Nor is it to be measured by the amount of money or proper-ty involved in the contract.   For if the party has suffi-cient legal capacity to make a bargain involving five,fifty or a hundred dollars, he is competent in the eye of the law to contract to the amount of thousands of dollars.   It had been proved that the appellant had not only managed and con-ducted his own business in Pennsylvania, and had been both a miller and a merchant, as well as a farmer there from the time he was of age and competent to act for him-self, but one or more of his familiar acquaintances in that State had deposed in the case, that he had sold thousands

of dollars' worth of goods to him whilst he was a merchant there. As to the opinions of such witnesses as may have impugned his mental capacity, or spoken of him as a man of inferior business capacity, they were entitled to no weight or consideration with the court, and furthermore, even what they had said is not evidence in the case without a statement of the facts and circumstances and the particular grounds on which they had formed such opinions, in order that the court may be able to judge of the weight and worth of them. But it was apparent from the depositions that the opinions of most of them were formed and based alone upon the one sided view which they have hastily taken of the very contract now in question.

A great distinction, however, exists between executory and executed contracts in this respect, and when the rescission of the latter is sought in a court of equity on the ground of alleged fraud, the proof of it must be strong and conclusive. But a false affirmation of the value merely of the thing sold, is not such proof of fraud. *Sug. on Vend.* 3. *Kinaird v. Lord Dean, Sug. on Vend.* 4 n. 2. *Dawes v. King,* 1 *Stark* 75. *Sanford v. Rose,* 2 *Tyler* 429. *Mann v. Betterly,* 21 *Ver.* 326. *Smith v. Richards.* 13 *Pet.* 26. *Taylor v. Fleet,* 4 *Barb. S. C. Rep.* 95. *Dunn v. Chambers,* 4 *Barb. S. C. Rep.* 376. *Tindall v. Harkinson,* 19 *Ga.* 448. As to inadequacy of price or consideration, in no case has a sale of real estate been set aside on that ground, unless it was so gross as to be of itself evidence of fraud. *Osgood v. Franklin,* 1 *Johns. Ch. Rep.* 23. *Mann v. Betterly,* 21 *Ver.* 326. 2 *Kent's Com.* 471. *Deaton v. Monroe,* 4, *Jones' Eq.* 39. *Taylor v. Taylor.* 6. *Ired.* 26. *Barratt v. Spratt,* 4 *Ired.* 171. Courts of law, as well as courts of equity, afford protection to those who are of unsound mind. They draw a well known line between sanity and insanity, but they cannot distinguish between different degrees of intelligence. Against the consequences of mere imprudence, folly, or that deficiency of intellect, even when it is clearly proved to exist, which makes mistakes easy, but does not amount to unsound or disordered intellect, even equity can give

no relief, unless it is positively and satisfactorily proved that the other party has taken advantage of it to do a certainly wrongful act. 1 *Pars. Contr.* 387. *Osmond v. Fitzroy* 3. *Pr. Wms.* 129. *Moth v. Atwood*, 5 *Ves. Jr.* 845. *Rippes v. Grant*, 4 *Ired.* 443. *Ruppert v. Dunn*, 1 *Richards.* 101. *Seymour v. Delancy*, 3 *Cow.* 446. *Hunt. v. Hunt.* 2 *Beaz.* 162.

*Fulton.* In the case of *Osmond v. Fitzroy*, 3 *Pr. Wms.* 129, the bond executed and delivered was set aside by the Master of the Rolls because the defendant was of weak mind merely, and the plaintiff had been guilty of a fraud in the contemplation of a court of equity, in procuring it from him as such. And it is on the same ground, and also because the law especially protects those who cannot protect themselves, that all transactions with feeble minded persons, whether they are so from age, sickness, or infirmity of intellect, are carefully watched. The whole law of infancy illustrates the principle; and applies it in many cases, by avoiding on this account transactions as fraudulent, which would not have been so characterized had both parties been equally competent to take care of themselves. 3 *Pars. on Contr.* 774.

*Gilpin, C. J.,* announced the decision of the Court. It is a maxim of chancery jurisprudence that there can be no equitable incapacity to contract on the ground of mental weakness or infirmity, without a legal incapacity to contract for the same reason; and the court does not consider that the evidence in this case shows the complainant to be as incapable of making such a contract, as his counsel seemed to think and had contended for in his argument. Whatever may have been his want of judgment, prudence, or of strength of mind, his capacity to attend to and conduct his own affairs in the several branches of business in which he had been engaged, and even to purchase and sell real estate before he moved into this State, seems never to have been questioned in any serious manner, at least, in the State from which he came; while no one could fail

to observe that the witnesses residing in this State, and who had only known him since he moved into it, and so state in their depositions, were very much, if not entirely influenced by the views which they have taken of the purchase in question, in the impressions which they have expressed as to his mental capacity and fitness to make such a contract, but which should not have been made the main or sole test by which the question of his capacity is to be determined in this case. For however unwise or unfortunate for him it may have been, if it was the only unwise or imprudent contract he has ever made, it certainly would not be sufficient of itself to establish his incapacity to contract for the purchase of another farm at that, or any other price. As to the mental infirmities of the complainant more particularly stated and relied on in the bill, that of want of knowledge and judgment in regard to the productive quality and the value of land in this State, and that degree of credulity which would render him the ready dupe and easy victim of unscrupulous and designing parties in a matter of contract like this, we must say that the first would not be evidence of inherent mental weakness or imbecility, if clearly established, while the latter is certainly not proved by the facts and the evidence in the case. And as this constitutes one of the main grounds of the bill and the prayer for rescission of the contract, as well as of the argument of the counsel for the complainant, and the mere matter of the misrepresentations alleged and complained of admitting them to have been proved as alleged, could not alone entitle him to the relief prayed for, according to the equity on which the whole case proceeds, we must confirm the decree of the Chancellor in the case in all respects; and let the decree of this court be so entered.